**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **CORNELIUS WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 3:24 C 50315 |
| | ) | |
| **CITY OF ROCKFORD, ILLINOIS;** | ) | Judge Rebecca R. Pallmeyer |
| **OFFICER ALEXANDER STONE ;** | ) | |
| **OFFICER D. SCHARLAU; OFFICER L.** | ) | |
| **FRANCK; OFFICER G. KIELY; OFFICER** | ) | |
| **ARGUELLES; and OFFICER BRANDON** | ) | |
| **BRADBURY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Cornelius Williams was the victim of mistaken identity. Arrested and briefly detained on a warrant intended for another man, Williams brings this lawsuit for deprivation of civil rights pursuant to 42 U.S.C. § 1983, alleging that the arresting officers violated the Fourth Amendment and subjected him to false imprisonment. Defendants seek summary judgment [30], arguing that the officers' conduct that led to the mistake was, at most, negligent, and claiming that they are shielded from liability by qualified immunity and immunity under the Illinois Tort Immunity Act. For the reasons explained here, the motion is granted in part and denied in part.

## BACKGROUND

### I.    Factual Background[1]

### A.    Plaintiff's Arrest

Sometime in September of 2023, Plaintiff Cornelius Williams received letters in the mail at his parents' home from attorneys offering to represent him on domestic violence charges. (DSOF [30-1] ¶ 31; Williams Dep. [30-8] 13:17–14:19.)  At first, Williams did not make much of them, thinking they represented "a simple misunderstanding," but after his mother continued to express concern, Williams went to the Winnebago County Courthouse on October 23, 2023 to get some answers.  (Williams Dep. [30-8] 15:3–9; DSOF [30-1] ¶ 32.).  Courthouse staff directed Williams to inquire at the Rockford Police Department, and Williams headed to the Rockford Police Department building, arriving around noon the same day.   (DSOF [30-1] ¶¶ 32, 33.) Williams approached the front desk and the person working there, after speaking with Williams, determined that there was a live warrant for his arrest and alerted officers to his presence in the building.   Officers Alexander Stone and Daniel Scharlau were dispatched to the building at approximately 12:24 p.m., and when they arrived, they verified that the warrant was indeed for Williams, arrested him, and moved him in handcuffs to a squad car.  (*Id.* ¶¶ 34–35; Williams Dep. [30-8] at 23:3–18.)  Williams asked the officers why he was being arrested and told them that they were making a mistake.  (DSOF [30-1] ¶ 36.)  From the back of the squad car, Williams asked Officer Stone several times to tell him what the warrant was for, but Stone's squad car computer was down and he was unable to access more information.  (*Id.* ¶ 37; Williams Dep. [30-8] at 24:2–7.)  There is no evidence that anyone else at the station investigated further, either.

---

[1]        The facts set forth here are presented in the parties' statements of fact pursuant to this court's Local Rule 56.1.  Defendants' Local Rule 56.1 Statement of Material Facts is cited here as "DSOF [30-1] ¶ ___."  Williams's Response to Defendant's Local Rule 56.1 Statement is cited here as "Pl.'s Resp. [33] ¶ ___." Williams has also submitted an Additional Statement of Facts, cited here as "PSOF [34] ¶ ___." Defendants' Response to Plaintiff's Additional Statement of Facts is cited here as "Defs.' Resp. [38] ¶ ___."

Two other officers—Officers Lynn Franck and Gary Kiely—drove Plaintiff to the jail, a four-minute drive from the police station. (DSOF [30-1] ¶ 38.) Williams was handcuffed during the drive, but the officers removed his handcuffs once they escorted him into the jail. (*Id.* ¶ 39; Williams Dep. [30-8] at 26:4–24.) On his arrival, Williams was "checked in" by a woman at a counter, evidently in the jail's booking area. (*Id.* at 27:16–18.) He asked whether officers could "please research out what's going on," and urged that his arrest was a mistake. (*Id.* at 28:7–14.) Officers evidently did so. They began making phone calls and asking Williams questions, including questions about any visible tattoos. (*Id.* at 28:19–24.) After some time, officers at the front desk determined that Williams's arrest was indeed a mistake. (*Id.* at 29:21–30:9.) They then gave Williams a ride back to his car, which was still parked outside the police station. (*Id.* at 30:21–24.) Williams was in custody for approximately one hour and eleven minutes. (DSOF [30-1] ¶ 46.)

### B.      Source of the Arrest Warrant

As it turns out, the warrant that resulted in Williams' arrest arose out of a domestic dispute involving another person with a nearly identical name: Cornelious Leonard Williams. (*See* Defs.' Exh. 5, Dobran Investigative Report [30-6] at 2.) On September 9, 2023 at approximately 10:23 p.m., Rockford Police Officer Diego Arguelles was dispatched to a home on Searles Avenue to address a domestic battery complaint. (DSOF [30-1] ¶ 6.) When he arrived, the victim of the battery told Officer Arguelles that the father of her child had battered her and that she wanted to press charges. (*Id.* ¶ 7.) The victim identified the suspect as Cornelious L. Williams, but she did not know how to spell his first name. She also did not know the date of his birth, but reported that he was 47 years old, and provided a detailed physical description of the suspect: he had an Aries tattoo on his chest and a snake tattoo on his neck, he wore glasses, he was around 5'9" or 5'10" in height, and his hair was cut into a "short fade." (*Id.* ¶¶ 8–10; PSOF [34] ¶ 4.) She also provided Officer Arguelles with the suspect's phone number and the name of his employer, and showed him photos of the suspect, his car, and the car's license plate. (DSOF [30-1] ¶ 10; PSOF [34] ¶

4.)  She also told Arguelles that she believed the suspect, though employed, was homeless. (DSOF [30-1] ¶ 12.) The relevant interaction between the victim and Officer Arguelles was recorded on Arguelles's body-worn camera.  (PSOF [38] ¶ 3.)

Officer Arguelles has testified that in preparing the police report that day, "he had 'pulled forward' information from the 'RMS'[2] database information for the wrong Cornelius Williams and failed to confirm the accuracy of that information."  (PSOF [38] ¶ 11.)   The report described the suspect as 49 years old with a date of birth of March 12, 1974 (Plaintiff's date of birth), "balding," and 5'7" tall.  (PSOF [38] ¶ 5; Defs.' Resp. [38] ¶ 5; *see* Def's Exh. 8, Incident Narrative of Officer Stone, [30-9] at 5.)   Arguelles also added information not provided by the victim, including a spelling of the suspect's first name, Plaintiff's date of birth, Plaintiff's residential address, and Plaintiff's Illinois driver's license number (PSOF [38] ¶ 6; DSOF [30-1] ¶ 19), and omitted information the victim had given him, including descriptions of the suspect's tattoos and the fact that he wore eyeglasses. (PSOF [38] ¶ 7; DSOF [30-1] ¶ 14.)  Officer Arguelles also failed to provide the victim with information regarding how to send in the photographs she had shown him of the suspect, his vehicle, and his license plate; he also failed to document having seen those photographs at all.  (DSOF [30-1] ¶¶ 15, 18.)  He did, however, take photographs of the victim's injuries and upload them to an internal Rockford Police Department system.  (*Id.* ¶¶ 16–17.) Defendants admit that Arguelles "should have," but failed to, "document[] his uncertainty" about the identity of the suspect.  (*Id.* ¶ 25, 26.)

The Rockford Police Department uses a standard process for obtaining arrest warrants in domestic violence cases.  First, the initial investigating officer prepares a report like the one Arguelles prepared, to be reviewed by the Winnebago County State's Attorney's Office.  If, after review, the State's Attorney approves charges, the domestic violence supervisor at the Rockford Police Department is notified and sends the case number to a detective who then prepares a

---

[2]     According to Sergeant Dobran, "RMS" stands for "report management system". (Dobran Dep. [30-5] at 36:14–15.)

criminal complaint in support of an arrest warrant. The detective appears before a judge for approval of the warrant. (*Id.* ¶ 20.) The department followed that process in this case. On September 13, 2023, a few days after receiving Arguelles's report, the Winnebago County State's Attorney's Office approved charges. (*Id.* ¶ 21.) Based on the information in Arguelles's report, Officer Bradbury, another officer in the Rockford Police Department, prepared two criminal complaints against a Cornelius Williams[3] with a date of birth of March 12, 1974. (*Id.* ¶¶ 21, 23; *see* Defs.' Exh. 8, Incident Narrative of Officer Stone, [30-9] at 5.) The complaint form called for a statement in which the officer "[b]riefly describe[d] how the crime was committed, how the defendant was identified as the perpetrator, and HOW YOU KNOW THESE FACTS." (PSOF [38] ¶ 26.) Within the factual summary, Bradbury identified the suspect as Cornelius Williams with a March 1974 date of birth, and stated that the facts set forth were presented by "Officer Bradbury on behalf of Officer Arguelles." (*Id.* ¶¶ 26–27.) Bradbury himself did not speak to the victim or to Arguelles to verify the information, nor did he review Arguelles's body-worn camera footage; but he nevertheless attested to the truth and accuracy of the information outlined in the complaints, including the identity of the suspect. (*Id.* ¶¶ 21–22.) On the same day, September 13, Officer Bradbury presented the criminal complaint to the judge, who found probable cause sufficient to authorize an arrest warrant for Plaintiff. (*Id.* ¶ 32.) Later that September, Plaintiff began receiving the letters described above, from attorneys offering to represent him in his domestic violence case.

### C. Investigation of the Erroneous Warrant

Fast forward now to the time of Plaintiff's arrest. While Williams was inside the jail, Officer Stone got his computer back up and running, and, evidently prompted by Williams's insistence

---

[3] The court notes that DSOF [30-1] ¶ 21 states that "Officer Bradbury prepared a criminal complaint against Cornelius William (DOB 3/12/74)." The court assumes that the misspelling of Williams's last name is a typo, as later in the DSOF, Defendants state that "Officer Bradbury told the judge that the individual who abused the victim was Cornelius Williams with a date of birth of March 12, 1974, as indicated in Officer Arguelles' report." (DSOF [30-1] ¶ 29.)

that his arrest was a mistake, Stone began to do more digging. (DSOF [30-1] ¶ 41; Def's Exh. 8, Incident Narrative of Officer Stone, [30-9] at 5.) Stone reviewed the initial case report prepared by Officer Arguelles and called the victim Arguelles had interviewed. After a brief conversation, the victim sent Officer Stone a photograph of the man who had assaulted her. (DSOF [30-1] ¶ 42; Defs.' Exh. 8, Incident Narrative of Officer Stone, [30-9] at 5.) Stone realized that Plaintiff was not the man in the picture and that the photograph was actually that of Cornelious L. Williams born on April 5, 1976. (DSOF [30-1] ¶ 43.) Stone called Cornelious L. Williams, who confirmed that he did, in fact, know the victim. Plaintiff was then promptly released.

Several remedial steps were taken in response. On October 23, 2023, at the request of Officer Bradbury, a Winnebago County judge vacated the warrant for Plaintiff's arrest. (*Id.* ¶ 47.) The Police Department assigned Sergeant Andrew Dobran to complete an internal investigation into Officer Arguelles's actions in preparing his September 9, 2023 report. (*Id.* ¶ 48.) Dobran reviewed Arguelles's body worn camera footage and Arguelles's case report, and interviewed Arguelles. (*See* Defs.' Ex. 5, Dobran Investigative Report [30-6] at 2–4.) Based on his review, Dobran concluded that Arguelles "did not complete a full and accurate report, nor did he conduct a thorough and comprehensive preliminary investigation." (PSOF [38] ¶ 17.) Specifically, searching by first and last name and using the information available to Arguelles, Dobran was able to "pull forward" information on the "RMS" database, and found seven possible matches for the name provided by the victim. (*Id.* ¶ 14; Defs.' Resp. [38] ¶ 14.) Dobran noted that Arguelles could have used the physical descriptors given to him by the victim, such as a description of the suspect's tattoos, to narrow down the list by reviewing the jail mugshot system, but failed to do so. Arguelles also failed to send the victim the link where she could upload the photos she had shown him. (PSOF [38] ¶ 17.) And finally, Dobran stated that, if unable to identify the suspect using these resources, Arguelles should simply have "entered the suspect into the report with the limited information he had at the time of the initial report and the Detective Bureau could have investigated further." (*Id.*) "The end result," according to Dobran's review, "was a false arrest

6

which could have been prevented based upon a thorough and accurate investigation." (*Id.*) Sergeant Dobran determined that Officer Arguelles's failures violated Rockford Police Department General Order 2.19, and the Department issued Arguelles a "Documented Counseling Session" (not further described in the record) as discipline for the violations. (DSOF [30-1] ¶ 53–54.)

### D. Williams Files Suit

Distressed by this experience, Williams filed a *pro se* complaint in the Circuit Court of Winnebago County [1] in July 2024, alleging he was arrested without probable cause. (Compl. [1] at 4.) Defendants removed the case to federal court and Williams, now represented by counsel, filed an Amended Complaint [15] in which he seeks to recover for the emotional distress of being wrongfully arrested. He testified in his deposition that in the months following the arrest, he was "paranoid," "fearful," and "angry," and had "never experienced that before until this." (Williams Dep [30-8] at 43:21–44; 45:4–15.) He asserted, further, that his brief arrest caused him to miss out on an opportunity to bid for a construction project later that day. (*Id.* at 10:23–11:5; 37:12–39:14.) The amount he seeks to recover is not stated in his Amended Complaint, but his original complaint, filed in small claims court where recovery is capped at $10,000, seeks damages in that amount.

The Amended Complaint asserts three claims against Defendants under 42 U.S.C. § 1983. Count I alleges that Defendants Bradburry and Arguelles violated Williams's Fourth Amendment rights because, by "unlawfully causing a warrant to be issued for his arrest," they subjected him to unlawful seizure. (Am. Compl. [15] ¶ 27.) Count II alleges that Defendants Stone, Sharlau, Franck, and Kiely violated Williams's Fourth Amendment rights because they arrested and detained him "based upon a warrant that had been issued for a different person." (*Id.* ¶ 31.) Count III alleges that the City of Rockford is liable under Illinois state law for Williams's false imprisonment by its employee officers under a theory of *respondeat superior*. (*Id.* ¶¶ 34–35.) Defendants filed their answer [17] on October 4, 2024, denying Williams's allegations and

7

asserting qualified immunity as an affirmative defense to the federal claims, and the Illinois Tort Immunity Act as an affirmative defense to the state law claim. Williams voluntarily dismissed his claims against Defendants Stone, Scharlau, Franck, and Kiely [26, 27], which eliminated Count II. Defendants have moved [30] for summary judgment, arguing that, at most, Officer Arguelles and Bradbury acted negligently which is insufficient for liability under § 1983, and that Defendants are shielded from liability based on state and federal law immunities. The motion is fully briefed.

### LEGAL STANDARD

Summary judgment is appropriate if "'there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.'" *Johnson v. Edwards*, 164 F.4th 1074, 1079 (7th Cir. 2026) (quoting FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In considering a motion for summary judgment, the court construes "the facts in the light most favorable" to the non-moving party and draws "all reasonable inferences in its favor." *Waukegan Potawatomi Casino, LLC v. City of Waukegan*, 128 F.4th 871, 873 (7th Cir. 2025). It does not "weigh evidence or make credibility determinations." *Johnson*, 164 F.4th at 1079.

Once a motion for summary judgment has been properly supported, the opposing party must produce affirmative evidence showing there is more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). An opposing party must produce affirmative evidence raising a genuine issue for trial; they may not rest upon allegations in the pleadings. *Anderson*, 477 U.S. at 256–57 (1986). Speculation "cannot create a genuine issue of fact that defeats summary judgment" and "is insufficient to defeat a summary judgment motion." *Flowers v. Kia Motors Fin.*, 105 F.4th 939, 946 (7th Cir. 2024).

**DISCUSSION**

I.      **Unlawful Seizure Claims**

Williams brings unlawful seizure claims against both Officer Arguelles and Officer Bradbury.  An unlawful arrest occurs when a person is arrested by police without probable cause. *Hardrick v. City of Bolingbrook*, 522 F.3d 758, 762 (7th Cir. 2008).  Williams alleges that Arguelles and Bradbury's conduct led him to have a warrant out for his arrest that was not supported by probable cause.  The court will address each Defendant in turn.

A.      **Officer Arguelles**

Defendants seek summary judgment on the unlawful seizure claim against Officer Arguelles, arguing (1) that Arguelles acted, at worst, negligently in preparing his report, so the undisputed facts are insufficient to establish liability under a § 1983 claim, and (2) that Officer Arguelles is entitled to qualified immunity, as his actions did not violate a clearly established right.

"[N]egligent conduct by a government official is insufficient to support a claim under § 1983."  *Smith v. Erickson*, 684 F. App'x 576, 579 (7th Cir. 2017) (quoting *Harrell v. Cook*, 169 F.3d 428, 432 (7th Cir. 1999)).  Instead, "[a]n official satisfies the personal responsibility requirement of § 1983 if she acts . . . with a deliberate or reckless disregard of the plaintiff's constitutional rights."  *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)).  In the context of police work to obtain arrest warrants, "[a]n officer violates the Fourth Amendment when he 'intentionally or recklessly includes false statements in a warrant application' that were material to the judge's finding of probable cause." *Klein v. Town of Schererville*, No. 22-1842, 2023 WL 119633, at *2 (7th Cir. Jan. 6, 2023) (quoting *Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019)).  An officer may also be deemed reckless by "fail[ing] to disclose facts that he or she knew would negate probable cause." *Hart v. Mannina*, 798 F.3d 578, 591 (7th Cir. 2015) (citation and internal quotation marks omitted)  "This standard [also] applies to officers" who, like Arguelles, did not directly apply for the warrant, but "provided information material to the probable-cause determination."  *Olson v. Champaign Cnty.,*

9

*Ill.*, 784 F.3d 1093, 1100 (7th Cir. 2015) (quoting *United States v. Leon,* 468 U.S. 897, 923 n.24 (1984)).

Williams argues that Arguelles's actions rose to this higher level of culpability because he "made false statements in, and omitted crucial exculpatory information from" the incident report used by Bradbury to obtain Williams's arrest warrant. (Opp'n [32] at 3.) Williams summarizes these false statements and omissions in his opposition brief:

> Arguelles' report omitted the fact that the victim described her assailant's large distinctive tattoos, that he wore eyeglasses, that she showed him photos of the suspect and his vehicle's license plate number, the location of his employer, that he was homeless, and that she did not know how to spell his first name or his exact date of birth. The incident report falsely states that the suspect was 49, five feet, 7 inches tall, and bald. In truth, the victim stated that the suspect, who is the father of her child, was 47, she described his haircut, and described him as five feet, ten inches tall.

(*Id.* (citations omitted).) These statements were material to the judge's probable cause determination, Williams argues, because "without Arguelles' false identification of Plaintiff as the suspect in the report there was no probable cause to issue an arrest warrant for [P]laintiff." (*Id.* at 5.) Defendants do not dispute that Arguelles's report was material to the judge's finding of probable cause. (Mem. [30-13] at 3.) Instead, they assert that his actions did not reflect "reckless disregard for the truth," and were insufficient to establish liability under § 1983. (*See id.* at 4.)

That Arguelles made false statements and omissions in his report, and identified the wrong Williams, is undisputed. (*Id.* at 3–4.) The central question is whether Arguelles's conduct was reckless versus merely negligent. *Miller v. Prince George's County*, 475 F.3d 621 (4th Cir. 2007), a case with nearly identical facts as here, provides guidance. In that case, the defendant officer conducted a computer search for a name (there, "Daniel Miller"); the search returned multiple results. The defendant officer then proceeded to narrow in on the plaintiff, whose age and race did not match the description provided by the victim. The plaintiff was arrested and held in custody for 19 days before police realized their error and released him. In plaintiff's claim for false arrest, the district court concluded the defendant officer was entitled to qualified immunity and granted

10

summary judgment, but the Fourth Circuit reversed. The court concluded that, viewing the evidence in the light most favorable to the plaintiff, "a reasonable jury could certainly conclude that the affidavit submitted by [the officer] contained misrepresentations and omissions made deliberately or with reckless disregard for 'whether they thereby made[ ] the affidavit misleading.'" *Id.* at 629 (quoting *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990)).

The evidence in this case, similarly, could support a conclusion that Arguelles's conduct was not merely negligent, but reckless. And, as in *Miller*, the court concludes Arguelles is not entitled to summary judgment on the basis of qualified immunity. That doctrine "operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations and internal quotation marks omitted). But it is "clearly established 'that a warrant request violates the Fourth Amendment if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue.'" *Lawson v. Veruchi*, 637 F.3d 699, 705 (7th Cir. 2011) (quoting *Knox v. Smith*, 342 F.3d 651, 658 (7th Cir. 2003)). Because a reasonable jury could find that Arguelles acted recklessly in creating his report, and because such actions are clearly established as unconstitutional, the court declines to enter summary judgment for Arguelles.

### B.      Officer Bradbury

Defendants are on firmer ground in arguing that Officer Bradbury is entitled to summary judgment. Recall that Bradbury relied on the statements in Arguelles's report when he prepared the criminal complaints. The Supreme Court has recognized that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *United States v. Hensley*, 469 U.S. 221, 231 (1985) (quoting *United States v. Robinson*, 536 F.2d 1298, 1300 (9th Cir. 1976)). Under what is known as the "collective knowledge doctrine," an arrest is proper

even if the arresting officer does not "personally know all the facts that constitute probable cause" so long as that officer is "reasonably [] acting at the direction of another officer or police agency." *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (quoting *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998)). Thus, in *Suarez v. Town of Ogden Dunes*, 581 F.3d 591, 597 (7th Cir. 2009), where plaintiffs took issue with an officer's inclusion, in his warrant application, of facts of which he lacked first-hand knowledge, the Seventh Circuit concluded that a police officer "was entitled to rely on the collective knowledge of all the investigating officers in making out his warrant request," especially considering he identified other officers' observations as the source of those facts. *Id.* at 597. Similarly here, Bradbury was entitled to rely on the information contained in Arguelles's report when he prepared his criminal complaints, and acted in accordance with the Rockford Police Department's general policies and practices when he did so. (DSOF [30-1] ¶ 27.) Bradbury had no reason to suspect that the information in the report was false, because "Officer Arguelles made no indication in his report that he was uncertain about the identity of the suspect." (*Id.* ¶ 26.)

Williams insists that Bradbury is nevertheless liable because "Bradbury falsely asserted to the Judge in his signed probable cause statement that he had personal knowledge that the victim identified plaintiff as her assailant." (Opp'n [32] at 7.) But this mischaracterizes Bradbury's actions and statements. In preparing the criminal complaint, Bradbury never claimed to have personal knowledge of the suspect's identity. He signed the complaint, confirming the truth of a short paragraph summarizing the events of the alleged assault, but stated in the "Factual Summary" portion of the complaint form that he writes "on behalf of Officer Arguelles." (*See* Criminal Compl. [30-7] at 2–3, 5.) Bradbury is entitled to summary judgment.

## II.    False Imprisonment

Williams also brings a state tort law false imprisonment claim against the City of Rockford under a theory of *respondeat superior*. As explained above, Williams has withdrawn his claims against Officers Stone, Scharlau, Franck, and Kiely, and the court is granting judgment in favor

of Officer Bradbury. The only basis for imposing vicarious liability on the City is the conduct of Officer Arguelles. The City argues that it is entitled to summary judgment because Williams was ultimately arrested on a facially valid warrant and that the Illinois Tort Immunity Act shields the City from liability for Arguelles's conduct.

True, a facially valid warrant "generally shields an officer relying in good faith on the warrant from liability for false arrest [or false imprisonment]," *Brooks v. City of Aurora*, 653 F.3d 478, 483 & n.5 (7th Cir. 2011), but there is a recognized exception. Liability may be imposed, even where a warrant has issued, where an "officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth and no accurate information sufficient to constitute probable cause attended the false statements." *Id.* at 483 n.5, 483–86 (quoting *Lawson v. Veruchi*, 637 F.3d 699, 704 (7th Cir. 2011)) (affirming the district court's decision to treat the false arrest and false imprisonment claims as analytically the same). Because there is evidence from which a reasonable jury could find that Arguelles acted with reckless disregard, the state law false imprisonment claim survives.

That leaves the question of whether the City is shielded from liability under the Illinois Tort Immunity Act. Section 2-109 of the Act provides that a public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable, 745 ILCS 10/2-109, and Section 2-202 states that a "public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct," 745 ILCS 10/2-202. In short, if Arguelles is entitled to immunity, so too is the City of Rockford.

Under Illinois law, "the standard for assessing whether conduct is willful and wanton is remarkably similar to the deliberate indifference standard." *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001) (citation and internal quotation marks omitted). Zeroing in on what, precisely, constitutes deliberate indifference, the Seventh Circuit has articulated that "[t]he deliberate indifference standard reflects a mental state somewhere between the culpability poles of

negligence and purpose, and is thus properly equated with reckless disregard." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). These two principles taken together lead to the logical conclusion that actions exhibiting reckless disregard can also be classified as willful and wanton conduct for the purposes of assessing officer immunity under the Illinois Tort Immunity Act.

"Determining whether a public employee's actions amount to willful and wanton conduct is normally a question of fact to be resolved by a jury" under Illinois law, unless a court finds that "as a matter of law that the employee's actions did not amount to willful and wanton conduct [because] no other contrary conclusion can be drawn from the record presented." *Agwomoh v. Vill. of Dolton*, 2022 IL App (1st) 210892, ¶ 65, 469 Ill. Dec. 448, 459, 224 N.E.3d 773, 784 (1st Dist. 2022). But the court has concluded here that a jury could find that Arguelles acted recklessly, or that his actions constitute willful or wanton conduct. Immunity does not shield him in this case, and the court therefore denies the City's motion.

## CONCLUSION

Defendants' motion for summary judgment [30] is granted as to Williams's claims against Officer Bradbury, but denied as to his claims against Officer Arguelles and the City of Rockford. The arrest should not have happened; but the police department took prompt action to investigate the error (and later to discipline Arguelles), and Williams was released soon after his arrival at the jail. As his damages may be modest, the parties are encouraged to discuss settlement.

ENTER:

Dated: March 26, 2026

_____
REBECCA R. PALLMEYER
United States District Judge

14